IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TERESA PUENTE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-2714 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the court are Plaintiff Teresa Puente ("Puente") and Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), cross-motions for summary judgment. Puente appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. After considering the parties' filings and the applicable law, the Court finds that Puente's Motion for Summary Judgment (Docket Entry No. 15) should be granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 16) should be denied, and the Commissioner's decision denying disability income benefits be reversed, and the case be remanded, pursuant to sentence four, to the Commissioner for further proceedings.

## I.      BACKGROUND

On August 13, 2004, Puente filed an application for disability insurance benefits with the Social Security Administration ("SSA"), claiming that she had been disabled and unable to work since July 1, 2004. (R. 22, 72). Puente alleges that she suffers from neck and back pain, headaches, and depression. (R. 24, 72). After being denied benefits initially and on the reconsideration levels

(R. 29-41), on March 7, 2005, Puente requested an administrative hearing before an ALJ to review the decision. (R. 42).

A hearing was held on April 5, 2006, in Houston, Texas, at which time the ALJ heard testimony from Puente and Susan Rapant ("Rapant"), a vocational expert ("VE"). (R. 287-317). Puente was represented by a non-attorney (*i.e.*, a paralegal) at the hearing. (R. 62, 289). In a decision dated August 24, 2006, the ALJ denied Puente's application for benefits. (R. 22-28). On November 7, 2006, Puente appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 11). The Appeals Council, on April 13, 2007, denied Puente's request to review the ALJ's determination. (R. 8-10). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). With the assistance of an attorney, Puente filed this case on August 21, 2007, seeking judicial review of the Commissioner's denial of her claim of benefits. *See* Docket Entry No.1.

## II.     ANALYSIS

### A.     Statutory Bases for Benefits

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, Puente has acquired

2

sufficient quarters of coverage to remain insured for benefits through December 31, 2008. (R. 22, 24). Consequently, to be eligible for disability benefits, Puente must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

### B.   **Standard of Review**

#### 1.   **Summary Judgment**

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Hell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are

3

no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   **Administrative Determination**

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla but does not need to be a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for

4

that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are

for the Commissioner and not the courts to resolve." *Id.* (internal citations omitted).

### C.   **ALJ's Determination**

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is

capable of performing "substantial gainful activity," or is, in fact, disabled:

1.   An individual who is working and engaging in substantial gainful activity
     will not be found disabled regardless of the medical findings. *See* 20 C.F.R.
     § 404.1520(b).

2.   An individual who does not have a "severe impairment" will not be found to
     be disabled. *See* 20 C.F.R. § 404.1520(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of
     the regulations will be considered disabled without consideration of
     vocational factors. *See* 20 C.F.R. § 404.1520(d).

4.   If an individual is capable of performing the work she has done in the past,
     a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5.   If an individual's impairment precludes performance of her past work, then
     other factors, including age, education, past work experience, and residual
     functional capacity must be considered to determine if any work can be
     performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant

has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the

claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show

that other substantial gainful employment is available in the national economy, which the claimant

is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995). If the Commissioner is able to verify that other

work exists in significant numbers in the national economy that the claimant can perform in spite

5

of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot,

6

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since July 1, 2004, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairment: major depression (20 C.F.R. § 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has a residual functional capacity with no exertional limitations. However, due to her mental impairment, she is limited to no highly detailed work; none requiring sustained concentration, attention, persistence and pace for prolonged periods; and only occasional interaction with the general public.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(R. 24-26).  As to the fifth step, the ALJ concluded:

7.  The claimant was born . . . [in] 1961 and was 43 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 C.F.R. § 404.1563).

7

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564)..

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from July 1, 2004 through the date of this decision.

(R. 26-28).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Puente's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

D.      **Issue Presented**

Puente claims the ALJ's decision is not supported by substantial evidence.  Specifically, Puente argues that the ALJ failed to properly develop the testimony of the VE.  *See* Docket Entry No. 15, at 2.  The Commissioner disagrees with Puente's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 16.

E.      **Review of the ALJ's Decision**

1.      **Objective Medical Evidence and Opinions of Physicians**

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

9

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify. *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 404.1526(a). The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
>    (A)    You do not exhibit one or more of the medical findings specified in the particular listing, or
>
>    (B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of her unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993)

In the case at bar, the medical records reflect that Puente primarily has sought treatment for her mental health. Puente allegedly has suffered from depression since childhood, intensifying when she was 16 years old (*i.e.*, when her mother died) and again after the death of her husband (*i.e.*, 2004). (R. 279).  Puente, who was raised in Mexico and moved to the United States at age 11, has obtained a General Education Diploma ("GED") and has approximately two years of college. (R. 114, 293).  Puente has held clerical jobs as a seasonal income tax preparer and a notary public. (R. 114, 279, 294-295).  At some point, Puente served 14 months in prison for illegal activity. (R. 114).

On May 28, 2003, Puente visited the Mental Health Mental Retardation Authority ("MHMRA") of Harris County for a psychiatric diagnosis screen.  (R. 182-184).  Puente reported memory/concentration problems, crying spells, sadness, decision-making problems, and being sleepy. (R. 182).  Problems with Puente's primary support group also were noted.  (R. 182).  Puente was diagnosed with major depressive disorder,[1] recurrent.  (R. 183).  On June 11, 2003, Puente

---

[1] "Major depressive disorder" denotes a mood disorder characterized by the occurrence of once or more major depressive episodes and the absence of any history of manic, mixed, or hypomanic episodes. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 529 (29th ed. 2000).

began receiving outpatient mental health treatment through the Mental Health Mental Retardation Authority ("MHMRA") of Harris County. (R. 112-116, 181-182). Puente reportedly felt sad and helpless. (R. 112). Puente was diagnosed with major depression, moderate, recurrent. (R. 116). She was prescribed an anti-depressant and referred to individual therapy. (R. 116).

On July 9, 2003, Puente visited MHMRA for medication maintenance. (R. 192-193, 196). A "full" medication response was reported. (R. 192). Puente claimed her depression was under control and that she felt calm. (R. 193). She complained, however, that she still had problems with decision-making due to drowsiness. (R. 193). Her medications were adjusted, and a follow-up appointment was requested in five weeks. (R. 193).

On August 13, 2003, Puente returned to MHMRA for medication maintenance. (R. 194-195, 197). At this appointment, a "partial" medication response was reported. (R. 194). Puente complained of drowsiness. (R. 195). Her medications were adjusted, and a follow-up appointment was requested in five weeks. (R. 195). A separate progress note reveals that Puente failed to attend a psychiatric appointment on August 13, 2004. (R. 180).

On September 10, 2003, Puente visited MHMRA for medication maintenance. (R. 200-201). Her medication response was noted as "partial." (R. 200). Puente reported feeling calmer, but continuing to have memory/concentration problems. (R. 201). Puente's medication was adjusted, and a follow-up appointment was requested in two weeks. (R. 201). Progress notes indicated that Puente failed to attend a psychiatric appointments on September 24, 2003. (R. 180).

Puente failed to attend a psychiatric appointment on December 1, 2003. (R. 180). On December 5, 2003, Puente visited MHMRA for medication maintenance. (R. 202-203). It was reported that Puente was not taking her medication as prescribed. (R. 202). She had not taken her

12

medication in two months.  (R. 203).  Her medication response was noted both as "partial" and "none." (R. 202).  Puente complained of memory problems and depression.  (R. 203).  Puente's poor compliance was noted as well as her desire to continue treatment.  (R. 203).  A follow-up appointment was requested in ten weeks.  (R. 203).

On March 4, 2004, Puente visited MHMRA for medication maintenance.  (R. 158-159). Puente's medication response was reported as "full," but she complained of feeling sad and sleepy. (R. 159).  Her medications were adjusted.  (R. 159).  Also, on March 4, a psychiatric rating scale was completed by Puente and MHMRA.  (R. 173).  Puente reportedly had mild symptoms of depression and guilt and very mild symptoms of blunted affect and motor retardation.  (R. 173).  No other symptoms were noted as being present.  (R. 173).  During this same visit, a community ability scale was prepared.  (R. 175-176).  Under the section entitled "interference with functioning," Puente reportedly had a markedly abnormal mood and a markedly impaired response to stress and anxiety. (R. 175).  Puente's other responses on this scale were unremarkable.  (R. 175-176).

Progress notes reveal that Puente failed to attend a psychiatric appointment on April 8, 2004. (R. 180).  On April 15, 2004, Puente visited MHMRA for medication maintenance.  (R. 155-157). Progress notes indicated depression and anxiety.  (R. 155).  Her medication response was noted as "partial." (R. 155).  Puente reported she was "doing better," but complained of being tired.  (R. 156). Puente's assessment noted that she was still depressed and grieving the loss of her husband. (R. 156).  Her medication was continued, and a follow-up appointment was requested in five weeks. (R. 156).

On May 20, 2004, Puente visited MHMRA for medication maintenance.  (R. 152-154).  At that time, her progress notes reflected depression and anxiety.  (R. 152).  Puente reported doing a

"little better," but still lacking motivation and grieving her husband's death. (R. 153). Puente also reported having nightmares. (R. 153). Puente's assessment was revised to include personality disorder. (R. 153). Puente's medication was adjusted, and a follow-up appointment was requested in two weeks. (R. 153). On June 3, 2004, Puente returned to MHMRA. (R. 149-151). At that time, her medication response was reported as "full." (R. 149). Puente claimed she was doing "very good." (R. 150). She was assessed as "stable," and a follow-up appointment was requested in ten weeks. (R. 150).

Progress notes reveal that Puente failed to attend a psychiatric appointment on August 12, 2004. (R. 180). On August 20, 2004, Puente visited MHMRA. (R. 146-148). Puente's medication response was noted as "minimal." (R. 146). Puente complained of insomnia and nightmares. (R. 147). Progress notes reflect that Puente was decompensating. (R. 147). Her medications were increased and a follow-up appointment was requested in two weeks. (R. 147). A "plan review" also was prepared on August 20. Puente reportedly was doing "fair" with improved symptoms. (R. 170-171). Puente asserted she was more outgoing, but continued to have nightmares. (R. 170).

On September 3, 2004, Puente returned to MHMRA. (R. 143-145). Puente reported suffering from insomnia and nightmares. (R. 143). Puente's medication response was reported as "full." (R. 143). Her mood was recorded as improved. (R. 144). Puente's medications were adjusted, and a follow-up appointment was requested in five weeks. (R. 144).

On October 1, 2004, J. D. Marler, Ph.D. ("Dr. Marler"), a physician with SSA, completed a Mental Residual Functional Capacity Assessment form that indicated that Puente was not significantly limited in 13 of 20 areas of functioning. (R. 117-120). Dr. Marler only found moderate limitations in the following seven areas of functioning: the ability to understand and remember

14

detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without rest periods of unreasonable frequency or duration; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to travel in unfamiliar places or use public transportation. (R. 117-118). According to Dr. Marler, Puente's alleged mental limitations were not fully supported by the evidence of record. (R. 119).

Also, on October 1, 2004, Dr. Marler completed a Psychiatric Technique Review Form, rating the degree of Puente's function limitations under listing 12.04C (Affective Disorders). (R. 121-134). Dr. Marler found no episodes of decompensation for extended duration, mild difficulties in restriction of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 131).

On October 8, November 1, and November 12, 2004, the MHMRA records merely noted Puente's medications. (R. 140-142). No other progress notes were made part of the record for these visits. A subsequent notation reflects that Puente missed two appointments scheduled for October 25 and November 8, 2004. (R. 166-167, 169, 180). On December 10, 2004, Puente visited MHMRA for medication maintenance, complaining of insomnia. (R. 135-136). Puente's medications were adjusted and blood work was requested. (R. 138-139).

On February 1, 2005, Puente visited the emergency room of Memorial Hermann Northwest Hospital, complaining of neck and back pain, and headaches. (R. 258-274). Puente was diagnosed with cervical radiculopathy, prescribed medication, and discharged that same day. (R. 265, 273-

274).  On February 18, 2005, Puente visited MHMRA for medication maintenance.  (R. 232-236).

Her medication response was reported as "full."  (R. 233).  Puente, however, reported that she had

stopped taking her medication because she was taking Ibuprofen for neck pain and the combination

made her too sleepy.  (R. 233).  Puente claimed that she was no longer sad and the nightmares were

gone, but she still felt anxious and worried.  (R. 233).  On a scale of 1-10, Puente's overall level of

functioning was noted as an 8.  (R. 233).  Her medications were continued, and a follow-up

appointment was requested in ten weeks.  (R. 235).

On May 16, 2005, Puente returned to MHMRA for medication maintenance.  (R. 237-240).

Her medication response was reported as "full," and her overall level of functioning remained at 8

out of 10.  (R. 237).  Puente claimed depression due to a fight with her sister-in-law.  (R. 238).  Her

medications were continued, and a follow-up appointment was requested in four weeks.  (R. 239).

On June 6, 2005, a psychiatric diagnosis screen was prepared by MHMRA.  (R. 241-242).

Puente's diagnoses were major depressive disorder, recurrent and personality disorder.  (R. 241).

Problems with Puente's primary support group were noted.  (R. 241).  On June 9, 2005, Puente

visited MHMRA for medication maintenance.  (R. 243-245, 248).  Her medication response was

noted as "full," and her overall level of functioning continued to be reported as 8 out of 10.  (R. 243).

Puente claimed that she was feeling better, had more energy, and an improved mood.  (R. 244).  Her

medications were continued, and a follow-up appointment was requested in eight weeks.  (R. 244-

245).

On August 18, 2005, Puente visited the Casa de Amigos Clinic, complaining of neck and

knee pain as well as anxiety.  (R. 276).  There are no other treatment records for Puente for a

physical impairment.

On September 2, 2005, Puente returned to MHMRA for medication maintenance. (R. 249-252). Puente's medication response was reported as "full," and her overall level of functioning increased to 9 out of 10. (R. 249-250). Progress notes reveal that Puente had missed many appointments, that she had not taken her medication for several days, and no longer wanted to take medication. (R. 250). Puente's assessment was "stable." (R. 250). In accordance with Puente's choice, it was recommended that Puente gradually decrease her medication and return for a follow-up appointment in eight weeks. (R. 250-251).

On October 28, 2005, Puente visited MHMRA for medication maintenance. (R. 253-255). Puente asserted that she was doing well and no longer wanted to continue her medication. (R. 254). Puente's assessment was reported as stable. (R. 254). It was recommended that her MHMRA case be closed. (R. 254).

On May 31, 2006, Puente met with J. L. Paterson, Ph.D. ("Dr. Paterson") for a psychological evaluation for the Disability Determination Division. (R. 279-283). Upon review psychological testing, Dr. Paterson concluded that Puente functioned in the borderline range of intelligence and her academic skills ranged from average in math to moderately deficient in reading and spelling. (R. 282). Dr. Paterson noted Puente's long-standing depression. (R. 282). Dr. Paterson assigned Puente a Global Assessment of Functioning Score ("GAF")[2] of 60. (R. 282).

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed 2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning. The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. A GAF rating of 60 indicates "moderate" difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *See id.* at 34.

On May 31, 2006, Dr. Paterson also completed a form entitled Medical Source Statement of Ability to do Work-Related Activities (Mental). (R. 284-286). He noted Puente had marked restrictions in her ability to do the following: understand and remember detailed instructions, carry out detailed instructions, and respond appropriately to work pressures in a usual work setting. (R. 284-285). Dr. Paterson found moderate restrictions in Puente's ability to make judgments on simple work-related decisions, as well as to interact appropriately with the public, supervisors, and/or co-workers. (R. 284-285). Finally, Puente demonstrated slight restrictions in her ability to understand, remember, and carry out short, simple instructions. (R. 284).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485.

Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise

unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that, even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

Here, the ALJ correctly determined that Puente's allegations of neck and back pain as well as headaches were non-severe impairments. (R. 24). With the exception of one visit to the emergency room and a visit to a clinic, there is an absence of medical records for treatment of these alleged physical impairments. This indicates that they did not impose more than a slight limitation on her ability to perform basic work activities, and, thus, are not severe impairments. *See Stone v. Heckler*, 752 F.2d 1099, 1101-1102 (5th Cir. 1985); *see also* 20 C.F.R. § 404.1520(c).

With respect to her alleged mental impairment, the ALJ properly found that Puente's depression did not meet the requirements of listing 12.04C. *See* 20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.04. Indeed, the records reflect that Puente had good medication response, and, ultimately, she voluntarily stopped taking her medication and receiving treatment with the MHMRA. There is no evidence in the record of repeated episodes of deterioration or decompensation, each of extended duration. As such, Puente's alleged mental disorder did not meet the listing criteria. *See id.*

## 2.   Subjective Complaints

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See*

*Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 & n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*,

925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

In the case at bar, Puente testified at the administrative hearing that she was unable to work due to severe neck and back pain as well as headaches. (R. 26, 296, 299-300).  The ALJ considered the evidence of record and Puente's testimony and concluded:

> . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.  As stated above, the claimant testified that she is in constant pain, however the lapse in medical treatment, as well as a statement that she does not take any medication for her pain do not support her allegations.

(R. 26).

The Court does not doubt that Puente suffers from pain; however, the records do not support a finding that Puente's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  As such, the ALJ's conclusion that Puente's alleged limitations and symptoms were not wholly credible is supported by substantial evidence.

### 3.    <u>Residual Functional Capacity</u>

Under the Act, a person is considered disabled:

> only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work.

42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner carries this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "she is familiar with the specific requirements of a particular occupation,

22

including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings—*i.e.*, SSRs. *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited

> to less than the full range of sedentary work are disabled will depend primarily on
> the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that

SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and

requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.*

To determine that an claimant can do a given type of work, the ALJ must find that the claimant can

meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler*, 712 F.2d 137,

142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In this case, the ALJ determined that Puente has a residual functional capacity with no

exertional limitations. The ALJ found, however, that due to Puente's mental impairment, she is

limited to "no highly detailed work; *none requiring sustained concentration, attention, persistence*

*and pace for prolonged periods*; and only occasional interaction with the general public." (R. 26)

(emphasis added). At the administrative hearing, the ALJ questioned the VE as follows:

Q:  I'm next going to ask you a series of hypothetical questions and in responding to those questions, I would like for you to take into consideration someone of Ms. Puente's age, education and vocational background you previously described. For purposes of the first hypothetical question, let me ask you to assume an individual with no exertional limitations of a duration of 12 months or more, assume, however, that I would find that this person would be precluded from performing highly detailed work, would be precluded from performing work that would require sustained concentration and attention and persistence and pace for prolonged periods and would be limited to only occasional interaction with the general public. Assuming those limitations, but no others, could a person so limited perform any of Ms. Puente's past relevant work, either as actually performed or is normally performed in the national and local economies?

A:  No, Your Honor.

Q:  Continuing to assume those limitations, but no others, do you know of other work in the national or local economies that could be performed by someone of Ms. Puente's age, education and vocational background who was so limited.

A:      Yes, Your Honor, there would be medium unskilled work.  An example would be a laundry worker, and the numbers for that job in the area would be 1,200 and 240,000 in the national economy.  A second example would be a kitchen helper, and the numbers for that job in the area would be 1,400 and 275,000 in the national economy, and a third example would be a hospital cleaner, and the numbers for that job in the area would be 900 and 195,000 in the national economy.

(R. 313-314).  Based on the VE's testimony and the framework of the Grid Rules, the ALJ concluded that Puente was able to perform medium, unskilled work, with certain mental limitations, including the jobs as a laundry worker, kitchen helper, and hospital cleaner.  (R. 26-28).

The VE's testimony is unclear; namely, it fails to explain why a person with Puente's mental limitations *could not* return to her past work, but could perform other work in the national economy.  A critical component of all competitive work, including unskilled, is the ability to sustain attention, persistence, and pace for prolonged or extended periods of time.  In this regard, the SSA's Program Operations Manual Systems ("POMS") lists "[t]he ability to maintain concentration and attention for *extended* periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)"among the "Mental Abilities Needed For Any Job."  *See* Docket Entry No. 15, at Exh. B (emphasis added); *see also* POMS, § DI 25020.010(B)(2)(a), available at http://policy.ssa.gov/poms.nsf/lnx.[3]  The ALJ's preclusion of Puente from jobs requiring "sustained concentration, attention, persistence and pace for prolonged periods" seemingly would preclude Puente from having any job based on the POMS requirement

---

[3] "POMS" refers to the SSA's handbook entitled Program Operations Manual Systems.  Although the POMS may provide useful insights, it has no legal force and does not bind the courts.  *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981).  As a handbook representing internal policy, the POMS simply informs the courts of present operating procedures of SSA employees.

that all jobs require a person to have the mental ability "to maintain concentration and attention for extended periods."[4]

Because Puente was not represented by counsel at the administrative hearing, the ALJ had a heightened duty to develop the record and clarify the ambiguity between the POMS and the VE's testimony. *See Kane v. Heckler*, 731 F.2d 1216, 1219-20 (5th Cir. 1984). Unfortunately, the ALJ did not cross-examine or further probe the VE's testimony as it related to the POMS provision. As such, the ALJ's opinion is unclear. *See generally SEC v. Chenery Corp.*, 332 U.S.194, 196-97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *Scott*, 30 F.3d at 35 (disability case invoking *Chenery* as basis for reversing because the "ALJ's vague and confusing reference" to vocational testimony left the court unable to tell whether he had properly considered it). Here, the ALJ's decision is not supported by substantial evidence and must be remanded to the Commissioner for a new hearing at which the VE can be properly questioned and the applicable provision of the POMS presented and considered by both the VE and the ALJ.

## III.   CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (Docket Entry No. 15), **DENIES** Defendant's Motion for Summary Judgment (Docket Entry No. 16), and **REMANDS** this case to the Commissioner for further proceedings not inconsistent with this Memorandum and Order.

---

[4] The terms "prolonged" and "extended" are interchangeable terms. *See* Docket Entry No. 15, at p. 12 n. 30.

The Clerk will provide copies to the parties.

Signed at Houston, Texas, on this the _____ day of September, 2008.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE